1
2
3
4                           UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7   RETIREE SUPPORT GROUP OF
    CONTRA COSTA COUNTY, et al.,          Case No.  12-cv-00944-JST
8                Plaintiffs,
9         v.                              **ORDER DENYING MOTION FOR
                                          TEMPORARY RESTRAINING ORDER
10  CONTRA COSTA COUNTY,                  AND GRANTING IN PART AND
                                          DENYING IN PART MOTION FOR
11               Defendant.               PRELIMINARY INJUNCTION**

                                          Re: ECF No. 183
12          Plaintiffs Retiree Support Group of Contra Costa County, et. al. ("RSG") have filed an Ex

13  Parte Motion for a Temporary Restraining Order ("TRO"), seeking to prevent further

14  communication between AFSCME Retiree Chapter 57 ("Chapter 57") and the settlement class in

15  this case.  ECF No. 183.  The motion also requests an order to show cause why a preliminary

16  injunction should not be issued.  Id.  Defendant Contra Costa County (the "County") joins in the

17  filing of the motion.  Id.  Chapter 57 was given an opportunity to oppose the motion, ECF No.

18  191, and RSG was also allowed to file a reply, ECF No. 195.  At oral argument, the parties agreed

19  that no further briefing or evidence was necessary in regards to the preliminary injunction, and so

20  the Court addresses that request as well.  The Court will deny the motion for a TRO and grant in

21  part and deny in part the request for a preliminary injunction.

22  **I.     BACKGROUND**

23          The factual history of this case has been set out in previous orders and will not be repeated

24  here.  See, e.g., ECF No. 174.

25          On June 14, 2016, the Court conditionally certified a settlement class and preliminarily

26  approved a settlement in this case.  ECF No. 137.  That order required that the Settlement

27  Administrator mail class notices to the class within twenty-five days after the date of the order, by

28  July 9, 2016, and set a deadline for class members to respond at sixty days after the class notices

1   were sent, by September 7, 2016.  Id. at 14.  A Fairness Hearing is scheduled for October 25,

2   2016.  ECF No. 179.

3          On June 17, 2016, the Court denied a Motion to Intervene filed by AFSCME Local 2700,

4   AFSCME Local 512, AFSCME Retiree Subchapter 142, and Richard Cabral (collectively, "the

5   Objectors").  ECF No. 174.  The Objectors sought to intervene in order to oppose the proposed

6   settlement.  Id.

7          On July 20, RSG, jointly with the County, filed this motion requesting a TRO.  ECF No.

8   183.  RSG alleges that during the week of July 4, AFSCME Retiree Chapter 57 ("Chapter 57"),

9   through its officers Nadine Peyrucain, Ruth Roe, and Mr. Cabral, sent to many class members a

10  letter urging them not to participate in the class settlement.  Id. at 3.  The letter included a form by

11  which recipients could opt out and object to the settlement, and in so doing agree to be represented

12  by Beeson, Tayer & Bodine, the same firm that represented the various objectors who filed the

13  Motion to Intervene. RSG contends that the letter is false and misleading and requests a TRO

14  enjoining Chapter 57 and its officers from communicating any further with the class members, as

15  well as a preliminary injunction that requires Chapter 57 to send a corrective notice, declares

16  ineffective any elections made by class members through Chapter 57's form, and enjoins Chapter

17  57 from further communications without prior approval.  Id. at 8-9.

18         Chapter 57, for its part, notes that RSG circulated a response letter to the class refuting

19  Chapter 57's letter.  ECF No. 191 at 11.  Chapter 57 contends that RSG's own letter is also

20  misleading, but it does not specify how.  Id.  Chapter 57 also has not requested any relief from the

21  Court.

22         In addition, RSG's motion also requests that the Court order Chapter 57 to show cause

23  why the Court should not issue a preliminary injunction in response to Chapter 57's

24  communications.  ECF No. 183 at 8-9.  Specifically, RSG requests (1) that a corrective letter be

25  sent[1] that corrects any false and misleading statements in Chapter 57's letter; (2) that any elections

26  made by class members using Chapter 57's form be invalidated; and (3) that a preliminary

27  _____

28  [1] Though RSG initially requests that Chapter 57 be required to send the notice itself, it has since
    amended the request to require the Settlement Administrator to send out the notice at Chapter 57's
    expense.  ECF No. 195 at 19.

United States District Court
Northern District of California

1   injunction be entered enjoining Chapter 57 from sending any further communications to class

2   members without prior review by the Court and the parties.  Id.

3          A declaration submitted by RSG's attorney, Jeffrey Lewis, indicates that Mr. Lewis sent an

4   e-mail to the three individuals who had signed the challenged communication with this motion and

5   related documents attached.  ECF No. 188 ¶ 7.  It also indicates that he sent the same documents

6   to an attorney for the firm of Beeson, Tayer & Bodine, and confirmed through subsequent e-mails

7   that this was sufficient to serve Mr. Cabral and Chapter 57.  Id.  Though Chapter 57 challenges

8   some of the statements made in Mr. Lewis's declaration, it does not appear to contest that Chapter

9   57 received effective service.  See ECF No. 191 at 20.

10          Chapter 57 was given leave to respond, and did so, on July 25, 2016.  ECF No. 191.  RSG

11   was similarly given leave to reply, and did so, on July 27, 2016.  ECF No. 195.  The Court held a

12   hearing on the motion on July 29, 2016.

## II.    LEGAL STANDARD

13          The Court applies a familiar four-factor test on both a motion for a temporary restraining

14   order and a motion for a preliminary injunction.  See Stuhlbarg Int'l Sales Co. v. John D. Brush &

15   Co., 240 F.3d 832, 839 n. 7 (9th Cir. 2001).  A plaintiff seeking either remedy "must establish that

16   he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

17   preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

18   public interest."  Am. Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052

19   (9th Cir. 2009) (quoting Winter v. Nat. Resources Defense Council, 555 U.S. 7, 20 (2008)).

20   Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that

21   the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22.

22          To grant preliminary injunctive relief, a court must find that "a certain threshold showing

23   [has been] made on each factor."  Leiva-Perez v. Holder, 640 F.3d 962, 966 (9th Cir. 2011).

24   Assuming that this threshold has been met, "'serious questions going to the merits' and a balance

25   of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

26   injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

27   that the injunction is in the public interest."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d

28

United States District Court
Northern District of California

1   1127, 1135 (9th Cir. 2011).

2        In addition, a movant seeking the issuance of an ex parte TRO must satisfy Federal Rule of

3   Civil Procedure 65(b), which requires a showing "that immediate and irreparable injury, loss, or

4   damage will result to the movant before the adverse party can be heard in opposition" and

5   certification of "efforts made to give notice and the reasons why it should not be required."  Fed.

6   R. Civ. P. 65(b)(1).

7   **III.**      **JURISDICTION**

8        In its opposition, Chapter 57 begins by disputing that the Court has the authority to issue

9   an order regulating its communications with the class.  It offers two arguments as to why this

10   Court lacks that authority.  First, it contends that the Court lacks authority over Chapter 57

11   because it is not a party to this action, and because Rule 23 is not a jurisdictional statute.  ECF No.

12   191 at 11.  Second, it argues that the requested relief would violate the Norris-LaGuardia Act by

13   interfering with a labor dispute.  <u>Id.</u> at 14.  As set forth below, both of these arguments are

14   unpersuasive, and the Court concludes it has the authority to address the dispute now before it.

15        **A.**      **Authority over Nonparties**

16        There is little dispute that the Court possesses the authority, under Rule 23, to regulate the

17   *parties*' communications to class members when those communications are false and misleading

18   and interfere with the class's due process rights.  <u>See</u> <u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 100

19   (1981).  The question raised by Chapter 57 is whether the Court possesses the same authority over

20   a *nonparty* when that party sends false and misleading communications to a class.

21        Chapter 57 argues only that "Rule 23 is not a jurisdictional statute and does not confer on

22   this Court the authority to regulate the speech of non-parties."  ECF No. 191 at 11.  However, the

23   cases it cites for this proposition, <u>Blyden v. Navient Corp.</u>, No. EDCV 14-02456-JGB, 2015 WL

24   4508069, at *9 (C.D. Cal. July 23, 2015); <u>Pioche Mines Consol., Inc. v. Dolman</u>, 333 F.2d 257,

25   264-65 (9th Cir. 1964); and <u>Simon v. E. Kentucky Welfare Rights Org.</u>, 426 U.S. 26, 40 (1976),

26   are inapposite.  <u>Blyden</u> and <u>Simon</u> both discuss the issue of whether a plaintiff who otherwise

27   lacks Article III standing may obtain it through Rule 23 by seeking class certification.  <u>Pioche</u>

28   addresses the question of whether a court's valid jurisdiction over the individual parties is lost if

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    the parties' putative class action did not comply with the requirements of Rule 23.  Neither of

2    those issues is relevant here.

3         RSG, for its part, cites several district court cases in which the court took curative action in

4    response to a nonparty's interfering communications with absent class members.  See ECF No.

5    195 at 12-13 (citing Williams v. Quinn, No. 05 C 4673, 2010 WL 3021576, at *3 (N.D. Ill. July

6    27, 2010); Georgine v. Amchem Products, Inc., 160 F.R.D. 478, 497–98 (E.D. Pa. 1995); In re

7    Synthroid Mktg. Litig., 197 F.R.D. 607, 610 (N.D. Ill. 2000); In re Lutheran Bhd. Variable Ins.

8    Products Co., No. 99-MD-1309PAMJGL, 2002 WL 1205695, at *2 (D. Minn. May 31, 2002); In

9    re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-MD-1720 JG, 2014 WL

10   4966072, at *31 (E.D.N.Y. Oct. 3, 2014), appeal withdrawn (Feb. 17, 2015)).

11        Generally, it appears that courts that have exercised authority over nonparties in this

12   context have done so on the basis of either Federal Rule of Civil Procedure 23, or under the All

13   Writs Act, 28 U.S.C. § 1651.  See In re Payment Card, 2014 WL 4966072, at *31 ("The proper

14   exercise of judicial authority in this context may have either a procedural basis, under Federal

15   Rule of Civil Procedure 23(d), or an equitable basis, under the All Writs Act.").  Those courts that

16   have invoked Rule 23 as the basis for authority have relied on the Court's duty, under Rule 23(d),

17   to protect the due process rights of absent class members through accurate notice procedures.  See,

18   e.g., Williams, 2010 WL 3021576, at *3 ("This court, however, must ensure that proper and

19   adequate notice is provided to the Class. This power extends to non-parties that interfere with this

20   duty of the court."); Georgine, 160 F.R.D. at 497–98 ("Included in my responsibility to direct to

21   the class the best notice practicable is the duty to ensure that the class receives accurate

22   information"); In re Lutheran, 2002 WL 1205695, at *2 ("Courts possess the inherent power to

23   protect the orderly administration of justice and to preserve the dignity of the tribunal." (quoting

24   Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1209 (11th Cir. 1985)).  Citing to Gulf Oil,

25   which is discussed further below, and Rule 23(d), a court in this district enjoined further

26   communications from two law firms whose bids to serve as lead counsel for an accounting fraud

27   class action were rejected, and who subsequently sent solicitations to class members seeking to

28   recruit them.  In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1239, 1241 (N.D. Cal.

1    2000).  The court referred to Rule 23(d)'s granting of "broad powers to make 'appropriate orders'

2    to ensure efficient and fair proceedings in a class action," which "include the authority to enjoin

3    communications with class members to protect them from undue interference."  Id. at 1242

4    (citations omitted).

5         Courts have also referred to the All Writs Act when addressing the actions of nonparties.

6    The act states that "[t]he Supreme Court and all courts established by Act of Congress may issue

7    all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the

8    usages and principles of law."  28 U.S.C. § 1651(a).  In In re Synthroid, 197 F.R.D. at 610, the

9    district court issued a corrective notice in response to a nonparty trade association's

10   communications with a settlement class, and while it declined to also enjoin them from further

11   communications, it concluded that it "is authorized" to do so "under the All Writs Act," and

12   "[t]hat power extends to non-parties."  The court cited to United States v. New York Tel. Co., 434

13   U.S. 159, 174 (1977), which dealt with a court order to a nonparty telephone company ordering

14   cooperation with federal law enforcement, and held that "[t]he power conferred by the [All Writs]

15   Act extends, under appropriate circumstances, to persons who, though not parties to the original

16   action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order

17   or the proper administration of justice[.]"  See also In re Payment Card, 2014 WL 4966072, at *31

18   ("In sum, where, as here, a district court retains exclusive jurisdiction over settlement agreements

19   and distribution of settlement funds pursuant to those agreements, it may issue orders necessary to

20   protect the settlement from threats by both parties and non-parties." (citation omitted)).

21        Having reviewed this case law, the Court concludes it possesses authority to grant the

22   requested relief against Chapter 57.  RSG has argued that Chapter 57's communications interferes

23   with the class's due process rights under Gulf Oil and Rule 23, and accordingly, those

24   communications would also "frustrate the implementation" of this court's efforts to properly

25   provide class notice to the settlement class.

26        **B.      The Norris-LaGuardia Act.**

27        The Norris-LaGuardia Act states in part that "[n]o court of the United States, as defined in

28   this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   injunction in a case involving or growing out of a labor dispute."  29 U.S.C § 101.  Thus, under

2   the act, the Supreme Court has struck down injunctions by district courts ordering an end to work

3   stoppages.  Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n, 457 U.S. 702, 704

4   (1982).

5          Chapter 57 contends that its "communications relate to its dispute with the County

6   involving the treatment of retiree health benefits under the parties' collective bargaining

7   agreement, and the County's use of the proposed class settlement to contravene state labor

8   relations law."  ECF No. 191 at 14.  Chapter 57 cites to declarations submitted in support of the

9   earlier Motion to Intervene.  As the Court noted in its order denying that motion, the crux of that

10  motion were allegations that the County, in negotiations with various retiree chapters, had taken

11  the position that the settlement in this case will govern over other alleged agreements on employee

12  benefits.  ECF No. 174 at 4.  Accordingly, Chapter 57 contends that its communications are

13  related to a "labor dispute" within the meaning of the Norris-LaGuardia Act – though it also

14  contends that RSG's broader lawsuit with the County is not.  ECF No. 191 at 15-16.

15         In addressing the applicability of the Norris-LaGuardia Act, this case "should be

16  interpreted with reference to the congressional purpose behind the" act.  Schuck v. Gilmore Steel

17  Corp., 784 F.2d 947, 949 (9th Cir. 1986).  "That purpose was to prevent the then widespread use

18  of the labor injunction as a means of defeating the efforts of labor to organize and bargain

19  collectively."  Id. at 949-50 (citation omitted).

20         The Objectors oppose the settlement because they believe the County will use it to

21  Objectors' disadvantage in collective bargaining negotiations.  Certainly, if RSG sought to insert

22  the Court into those negotiations, Chapter 57's Norris-LaGuardia Act argument might have some

23  teeth.  But that is not the dispute before this Court.  Rather, the question to be answered here is

24  whether the *letter* circulated by Chapter 57 *to the class*, and challenged in RSG's motion, involves

25  or grows out of a labor dispute.  Chapter 57's position on that question is decidedly less

26  compelling.  The letter makes no mention of any labor dispute between the retiree chapters and the

27  County, or even of collective bargaining generally; it focuses solely on reasons to reject the

28  settlement.

Chapter 57 does not contend that the Norris-LaGuardia Act bars the Court from adjudicating the case as a whole; nor could it, since that act does not bar federal courts from adjudicating a legal claim that an employer has failed to provide promised retiree benefits to its employees.  See San Diego Police Officers' Ass'n v. Aguirre, No. 05-CV-1581 H (POR), 2005 WL 3180000, at *10 (S.D. Cal. Nov. 5, 2005) ("[C]laims concern[ing] the failure to fund the retirement fund and unlawfully depriving, eliminating and/or reducing retirement benefits . . . do not constitute a "labor dispute" as intended under § 104.").  Chapter 57 is therefore forced to maintain a distinction between the lawsuit itself, which it contends does not fall under the act, and its communications to its members regarding the very same lawsuit, which it contends do fall under the act.  ECF No. 191 at 16-17.  This argument simply cannot be correct.  As discussed further at oral argument, Chapter 57's position would suggest that if the Court had granted the earlier-filed Motion to Intervene – that is, if the Objectors became parties to the case – they would be able to present arguments to the Court opposing the settlement, which the Court would have jurisdiction to entertain, while simultaneously circulating letters to its members making those same arguments, over which the Court could exercise no authority.  To state the argument in this way is to refute it.

Finally, in turning to the purpose of the Norris-LaGuardia Act, the Court concludes these communications do not grow out of a labor dispute.  As the Ninth Circuit has held, the purpose of the act is to prevent courts from "defeating the efforts of labor to organize and bargain collectively."  Schuck, 784 F.2d at 949.  Here, there is no attempt to prevent Chapter 57, or other retiree chapters, from bargaining with the County.  In fact, none of the relief RSG requests would affect Chapter 57's bargaining rights at all.

In sum, the Norris-LaGuardia Act does not divest the Court of jurisdiction over this action.  Accordingly, the Court will address the merits of RSG's motion.

## IV.    DISCUSSION

The Court will deny the requested TRO and grant in part and deny in part RSG's request for a preliminary injunction.  As set forth in more detail below, the Court begins by concluding that RSG has demonstrated a likelihood of success on the merits in regards to the need for

1    corrective action, as well as the likelihood of irreparable harm if no action is taken.  Balancing the

2    hardships to the parties, the Court concludes that the equities tip in RSG's favor regarding the

3    need to invalidate the opt-outs and issue curative notice, but not regarding the need to enact prior

4    restraints on Chapter 57's communications.  The same is true when considering which remedies

5    are in the public's interest.  Thus, the Court will grant RSG's request for invalidation of opt-outs

6    and curative notice, but not for any form of injunction concerning Chapter 57's future

7    communications.

8              **A.      Likelihood of Success on the Merits**

9                       **1.      Legal Standard**

10            "Because of the potential for abuse, a district court has both the duty and the broad

11   authority to exercise control over a class action and to enter appropriate orders governing the

12   conduct of counsel and parties."  Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981).  "The

13   prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is

14   broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in

15   particular but to safeguard generally the administering of justice and the integrity of the class

16   certification process."  O'Connor v. Uber Technologies, Inc., No. C-13-3826 EMC, 2014 WL

17   1760314, at *3 (N.D. Cal. May 2, 2014).

18            Gulf Oil mandates that "an order limiting communications between parties and potential

19   class members should be based on a clear record and specific findings that reflect a weighing of

20   the need for a limitation and the potential interference with the rights of the parties."  452 U.S. at

21   101.  "[S]uch a weighing — identifying the potential abuses being addressed — should result in a

22   carefully drawn order that limits speech as little as possible, consistent with the rights of the

23   parties under the circumstances."  Id. at 102.  An order under Gulf Oil "does not require a finding

24   of actual misconduct" — rather, "[t]he key is whether there is 'potential interference' with the

25   rights of the parties in a class action."  O'Connor v. Uber Technologies, Inc., No. C-13-3826

26   EMC, 2013 WL 6407583 at *4-5 (N.D. Cal. Dec. 6, 2013).

27            The parties (and non-parties) are free to encourage class members to opt out of or vote

28   against a class action settlement, provided they do so in a fair manner that avoids material

United States District Court
Northern District of California

9

misrepresentations or omissions.  Cf. Parks v. Eastwood Ins. Servs., Inc., 235 F. Supp. 2d 1082,

1082 (C.D. Cal. 2002) (holding that "a defendant employer may communicate with prospective

plaintiff employees" regarding a class action under the Fair Labor Standards Act, "unless the

communication undermines or contradicts the Court's own notice").  However, courts may limit

communications that improperly encourage potential class members to not join a suit, especially if

they fail to provide adequate information about the pending class action.  See O'Connor, 2014 WL

1760314 at *6-7.  The best notice will "contain an adequate description of the proceedings written

in objective, neutral terms, that, insofar as possible, may be understood by the average absentee

class member."  In re Nissan Motor Corp. Antitrust Litigation, 552 F.2d 1088, 1104 (5th Cir.

1977).

      Thus, courts in this district have imposed limitations on communications, and invalidated

agreements obtained through those communications, based on findings that the communications

were misleading, coercive, or omitted critical information.  See, e.g., O'Connor, 2013 WL

6407583 at *6 (invalidating arbitration agreements that "shrouded" a class action waiver within

one of many provisions in a Licensing Agreement); County of Santa Clara v. Astra USA, Inc., No.

05-3740 WHA, 2010 WL 2724512 (N.D. Cal. July 8, 2010) (invalidating releases obtained by

letter to putative class that did not attach plaintiffs' complaint, explain plaintiffs' claims or the

status of the case, or include contact information for plaintiffs' counsel); Camp v. Alexander, 300

F.R.D. 617, 620, 624 (N.D. Cal. 2014) (invalidating opt-outs obtained by letter to employees of

defendants stating the class action was "motivated by greed and other improper factors" and

"could result in the closure" of the business, and failed to include any explanation of plaintiffs'

claims, a copy of the complaint, or contact information for plaintiffs' counsel); Guifu Li v. A

Perfect Day Franchise, Inc., 270 F.R.D. 509, 518 (N.D. Cal. 2010) (invalidating opt-out forms

when defendant employer presented the forms in mandatory one-on-one meetings during work

hours, failed to provide forms in workers' primary language, and refused to give workers copies to

take home); Wright v. Adventures Rolling Cross Country, Inc., No. 12-0982 EMC, 2012 WL

2239797 at *5 (N.D. Cal. June 15, 2012) (enjoining defendants from communicating with

potential class members after they e-mailed members warning that if they participate in the suit,

1    their "past transgressions will become very public" and they will be "left with tattered reputations

2    and substantial legal bills").

3        Other courts throughout the country have also restricted communications or invalidated

4    releases when the communications suffered from similar deficiencies.  See, e.g., Kleiner v. First

5    Nat'l Bank of Atlanta, 751 F.2d 1193, 1197 (11th Cir. 1985) (defendant bank conducted telephone

6    campaign "shrouded" in "secrecy and haste" with explicit purpose of soliciting opt-outs from bank

7    customers); Freidman v. Intervet Inc., 730 F. Supp. 2d 758, 764 (N.D. Ohio 2010) (defendant

8    obtained settlement releases without informing class members they were giving up the right to

9    participate in putative class action); In re Currency Conversion Fee Antitrust Litigation, 361 F.

10   Supp. 2d 237, 251 (S.D.N.Y. 2005) (defendant did not inform class members of pending class

11   action).

12                    **2.       Analysis**

13       RSG contends that curative action is necessary because Chapter 57's letter contained

14   misleading and untrue statements.  Though Chapter 57 argues that the letter is factually accurate,

15   ECF No. 191 at 8-11, a review of the communication sent to class members, which has been

16   submitted by RSG as an exhibit, see ECF No. 188 at 5, reveals a number of significant

17   misstatements and omissions.  To begin, while the letter refers to a "Settlement" that is "the result

18   of an agreement between the County and RSG," it provides no information about the underlying

19   case from which the settlement resulted.  ECF No. 188 at 5-6.  Indeed, the letter does not even

20   mention the existence of litigation at all, leaving recipients who may have received the letter prior

21   to the class notice to simply conjecture about why the settlement was reached.  The letter does not

22   identify the case name and number, any of the claims brought by RSG, the Court in which the case

23   was filed, or any other way by which recipients could learn about the case.  Nor does the letter

24   identify the class's counsel or provide any way for the recipients to contact them.  See County of

25   Santa Clara v. Astra USA, Inc., 2010 WL 2724512 at *6 (finding that communications "misled the

26   putative plaintiff class" because it "did not contain the complaint or Ninth Circuit opinion, did not

27   describe the claims, did not contain the current status of the case, [and] did not provide contact

28   information for the plaintiffs' attorneys).  Surprisingly, the letter does not even appear to provide a

United States District Court
Northern District of California

11

1    way for recipients to contact the senders of the letter or their counsel, other than a stock letterhead

2    for Chapter 57 at the top of the page.  The sole form of contact made available to the recipients

3    was the opt-out form provided by Chapter 57.

4          Next, the Court finds that there are three significantly misleading statements in Chapter

5    57's letter.  First, it asserts that following the settlement, surviving spouses of deceased retirees

6    will not receive any County contributions to their premiums, an outcome that "is not equitable," as

7    "'[c]lass members' will be prevented from ever having the county contribute to the surviving

8    spouse's health care costs."  ECF No. 188 at 5.  As RSG points out, however, this has long been

9    the County's policy, with or without the settlement.  Second, the letter similarly asserts that

10   "Retirees with Medicare are not pooled with active employees" for the purpose of their premiums,

11   but once again fails to note that this is already true, and so is not something the settlement

12   changes.  Id. at 6.

13         In its briefing and at oral argument, Chapter 57 contends that technically, these statements

14   contain no factual errors, since it is true that class members' spouses will not receive contributions

15   and that Medicare-eligible retirees will not be pooled with active employees.  However, this

16   semantic splitting of hairs ignores the clear –and quite obviously intentional – implication of the

17   language, which is that the settlement will *cause* these alleged deficiencies in coverage when in

18   fact it does not.  See Williams v. Quinn, 2010 WL 3021576, at *3 (finding that it was misleading,

19   in a class action of residents of mental institutions, for a nonparty to suggest that a proposed

20   settlement was undesirable because it provided no guarantee that the institutions would continue to

21   be funded, when "there is not presently any guarantee that Illinois will fund" the institutions).

22   Also, there would be no need to bring these provisions to class members' attention, and no

23   likelihood of their persuading anyone, if the class members were already fully aware of them.  The

24   persuasive force of these sentences instead comes from the implication that the settlement is taking

25   something away, a conclusion supported by the structure of the letter.  The sentences are included

26   in a list of bullet points following the phrase "What does the 'Settlement' *provide*."  ECF No. 188

27   at 5 (emphasis added).

28         Third, and most significantly, the letter also includes the following bullet point:

United States District Court
Northern District of California

- What do you get from the "Settlement"? **NOTHING.** You already enjoy and receive all the things that are included in the settlement, members of the "Class" are agreeing to things that can never be changed or renegotiated.

ECF No. 188 at 6. The only reasonable interpretation of this statement is that the settlement fails to confer any benefits on the class that they do not already enjoy. Put another way, the letter tells the class that if the settlement is rejected, the case is litigated, and the County prevails in all respects, the class's situation will be the same as if the settlement had been approved.

This statement is transparently false, and by itself perhaps constitutes grounds to correct the letter and invalidate any resulting opt-outs. The County has quite clearly disputed whether the class's benefits "can never be changed or renegotiated" – indeed, that dispute is the reason this lawsuit was filed four years ago. The statement that the class will receive "nothing" from the proposed settlement is also demonstrably wrong, and in fact contradicts this Court's prior order preliminarily approving the settlement. See ECF No. 169 (identifying the benefits provided by the settlement).

Lastly, Chapter 57 provides an opt-out form for the recipients to submit, which indicates they "do not wish to be covered by the settlement" and that they authorize the firm of Beeson, Tayer and Bodine to represent them in opting out of and objecting to the settlement. ECF No. 188 at 7. This form, too, is misleading and confusing. For one, the form includes instructions to "sign and date and return in the enclosed envelope," with the clear implication that completing the form will opt out of the settlement, but the enclosed envelope is in fact addressed to Chapter 57, not to the Settlement Administrator. Next, the form purports to authorize a law firm to "represent me for the limited and sole purpose of submitting my request to opt-out and objections to the settlement," but does not allow the recipient to specify whether they intend to opt-out or to object. Finally, neither the form nor the letter explains the effects of opting out or objecting.

For all of these reasons, RSG has shown that it is likely it will succeed in demonstrating that court action is necessary under Gulf Oil to remedy potential confusion caused by Chapter 57's communications with the class.

**B.     Likelihood of Irreparable Injury**

Next, the Court must determine whether the parties have demonstrated the likelihood of

1   irreparable harm.  The parties have done so here – indeed, RSG has not only demonstrated a

2   likelihood of harm but has been able to collect, in a very short period of time, unrebutted evidence

3   that class members have already been harmed by the misleading communications.  RSG states in

4   its motion that class members have reported that they opted out of the settlement in response to

5   Chapter 57's letter, but wished to rescind this decision after receiving further information.  ECF

6   No. 183.  It submits declarations from both lawyers who fielded these statements from class

7   members, and from class members themselves.  ECF Nos. 184-187.  While Chapter 57 objects to

8   these declarations on evidentiary grounds,[2] it does not contest that its letter caused class members

9   to opt out of the settlement.  Given the Court's finding that the letter is misleading, and that RSG

10   has been able to obtain evidence of harm to particular class members so quickly, it is reasonable to

11   assume that other members of the class have also been affected.

12        This harm is irreparable.  Class members have a due process right to not be misled while

13   they are deciding whether to participate in a class settlement affecting their rights.  See O'Connor

14   v. Uber Technologies, Inc., No. C-13-3826 EMC, 2014 WL 1760314, at *3 (N.D. Cal. May 2,

15   2014) (concluding that courts have a duty to preserve the integrity of the class action process).

16   Members of this class are, by definition, of retirement age and some portion are undoubtedly

17   elderly.  As noted above, a Fairness Hearing has been set for October 25, and class members have

18   until September 7 to respond to the class notice.  Class members are therefore currently within

19   their limited time window for deciding how they wish to respond to the settlement.  Without

20   remedial action from this Court, they will be forced to make that decision based on false and

21   misleading information.

22        Chapter 57 contends that this harm is not irreparable because it has pledged to honor any

23   requests by class members who now wish to rescind their submitted opt-out forms.  ECF No. 191

24   at 22.  This argument assumes that all class members who were misled by the letter and submitted

25   an opt-out form will take the additional step of affirmatively requesting to rescind their request.

26   There is no basis in fact for this assumption.

27

28   ---
    [2] See ECF No. 191 at 22.  However, as RSG notes, a court is not constrained by the Federal Rules of Evidence when ruling on preliminary injunctive relief.  ECF No. 195 at 20.

United States District Court
Northern District of California

1
2

Accordingly, the Court concludes that irreparable harm has occurred, and will continue to occur, without some form of corrective action.

3

**C.      Balance of Hardships**

4
5
6
7
8

In turning to the balance of hardships, the Court must next decide what action is appropriate.  As an initial matter, because the Court resolves the request for a preliminary injunction in this order, it will deny the request for a TRO.  A TRO is a stopgap measure to prevent further harm until proceedings on a preliminary injunction are complete, and therefore is unnecessary here.

9
10
11
12
13
14

The Court finds that the hardships imposed on the parties in the absence of relief would be significant.  RSG has demonstrated that class members' due process rights to make a decision regarding the class settlement have been irreparably harmed by Chapter 57's misleading communications.  More broadly, individual class members could endure significant hardship if they were misled into opting out and were ultimately prevented from participating in a settlement they believed, with the benefit of complete information, could benefit them.

15
16
17
18
19
20

On the other hand, the hardships imposed upon Chapter 57 may also be quite significant because, depending on the corrective action taken, they could implicate Chapter 57's free speech rights under the First Amendment.  As Chapter 57 notes, RSG has effectively asked for a prior restraint on Chapter 57's communications with its members; Chapter 57 describes it as a "gag order" that it contends "is unprecedented and facially invalid under the First Amendment."  ECF No. 191 at 17.

21
22
23
24
25
26
27
28

As noted above, <u>Gulf Oil</u> requires this Court to base its ruling on a clear record and specific findings that justify "a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances."  452 U.S. at 100-101.  An order restricting speech should "sweep[] no more broadly then necessary," especially when considering prior restraints.  <u>Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations</u>, 413 U.S. 376, 390 (1973).  "Availability of less restrictive alternatives is, if not dispositive, an essential factor that a court must consider before ordering a restraint on speech."  <u>Fleury v. Richemont N. Am., Inc.</u>, No. C-05-4525 EMC, 2007 WL 2349284, at *3 (N.D. Cal. Aug. 15, 2007) (citing to <u>Gulf Oil</u>,

United States District Court
Northern District of California

15

452 U.S. at 104). Thus, the <u>Fleury</u> court noted that if less restrictive alternatives such as counterspeech by the opposing party or curative notice are available and plausible solutions, they should be used before resorting to prior restraints. <u>Id.</u> at 3-4.

Here, RSG has requested three remedies: (1) the invalidation of any opt-out elections obtained through Chapter 57's misleading communications; (2) a curative notice sent to the class; and (3) that Chapter 57 receive prior approval from this Court and the parties before communicating any further with the class. Beginning with the first two, less intrusive remedies requested, the Court concludes they would impose minimal hardships on Chapter 57. Those class members who still wish to opt-out after they receive the curative notice regarding the settlement may certainly do so. Chapter 57 asserts that it would be unprecedented to compel it to send a curative letter that is authored by RSG or some other party to the class. ECF No. 191 at 17. Such a remedy would indeed be drastic, and the Court will not require it. Instead, it will adopt RSG's amended request, which is to require the Settlement Administrator to circulate the notice, and Chapter 57 merely to reimburse the administrator for the costs of printing and distribution.

As for RSG's final request to restrict further communications from Chapter 57, the Court concludes that the hardships would be too significant on Chapter 57 to warrant it. Importantly, RSG requests a restriction on *all* communications between Chapter 57 and the class. ECF No. 183 at 9. This could potentially prevent Chapter 57 from communicating in any way with those of its members within the class, regardless of subject or context. It could, for example, prevent Chapter 57 from holding meetings or coordinating its efforts in its dispute with the County or other representative issues.

Moreover, the availability of the less restrictive remedies, in the form of invalidating opt-outs and sending a curative notice, counsel strongly against the further step of restricting Chapter 57's speech. The central harm to be remedied here is confusion and misinformation to the class caused by Chapter 57's communications. Invalidating any opt-outs will remove the most tangible consequence to this, by allowing class members to reconsider their responses, while the curative notice will largely or entirely remedy any confusion. It is less clear what additional benefit a prior restraint would provide that these two less restrictive alternatives do not.

1    RSG's counsel offered a number of points in response at oral argument.  He noted that the

2    class consists of retirees, many of whom are elderly, who may be unwilling to or incapable of

3    wading through several notices to fully inform themselves regarding the settlement's specifics.

4    He also contended that the burden of the requested injunction is lessened by the fact that Chapter

5    57 would not be prevented outright from communicating with the class, but merely required to

6    obtain approval of those communications.  Finally, he emphasized the degree of harm caused by

7    Chapter 57's communications, given the numerous and significant misrepresentations and the

8    available evidence that class members had relied on the communications to their detriment.

9    These are worthwhile considerations.  There is no doubt that the class members have been

10   significantly harmed by Chapter 57's misleading communications, and if there were reason to

11   believe that Chapter 57 would again attempt to mislead its constituents, RSG's requested

12   injunctive relief would likely be appropriate.  As it currently stands, however, the Court cannot

13   grant this relief.  Under Gulf Oil, it must provide specific findings for its conclusion that its

14   granted relief "limits speech as little as possible."  A prior restraint at this stage would not support

15   such a finding.

16   In sum, the Court concludes that in regards to the invalidation of the opt-out elections and

17   the issuance of a curative notice, the balance of hardships tilts in RSG's favor.  In regards to the

18   requested restrictions on Chapter 57's communications with the class, however, the balance of

19   hardships tilts in Chapter 57's favor.

20   **D.      Public Interest**

21   As with the balance of hardships, the public interest at issue depends on the remedy.  In

22   regards to the invalidation of opt-outs and the issuance of a curative notice by the Settlement

23   Administrator, this order serves the court's duty "not only to protect class members in particular

24   but to safeguard generally the administering of justice and the integrity of the class certification

25   process."  O'Connor v. Uber Technologies, Inc., No. C-13-3826 EMC, 2014 WL 1760314, at *3

26   (N.D. Cal. May 2, 2014).  As such, it is in the public's interest.

27   A limitation on Chapter 57's communications with at least some of its members, however,

28   is not in the public interest.  As noted above, the Court must carefully tailor any restriction on

17

speech to the specific record before it.  Here, it has concluded that enjoining Chapter 57's communications would unnecessarily infringe on its First Amendment rights.

## CONCLUSION

Accordingly, the Court denies RSG's motion for a TRO and grants in and denies in part its request for preliminary injunctive relief.  It will grant RSG's request to invalidate the obtained opt-outs and to issue a curative notice, and deny its request to enjoin further communications from Chapter 57.  The parties and Chapter 57 are hereby ordered to meet and confer, and submit by Monday, August 1, 2016 at 5:00 p.m., a proposal that covers the following:

1.    A process by which the Settlement Administrator shall determine which class members wish to invalidate their opt-out elections based on the misleading communications sent by Chapter 57.

2.    A proposed form of corrective notice.  The notice will be issued on court letterhead and should inform the recipients that any opt-out elections obtained through Chapter 57's form and communications have been invalidated by the Court, as well as the reasons for the invalidation.

3.    A proposed method to confidentially submit to the Settlement Administrator a complete list of the recipients of Chapter 57's communications.  The Settlement Administrator shall distribute the corrective notice only to those recipients.

4.    A responsible official shall certify, under penalty of perjury, that the list submitted to the Settlement Administrator is a complete and accurate list of the persons who received Chapter 57's letter, and the official's declaration shall be filed without attachment on the docket.  Chapter 57 shall also lodge with the Court a copy of that declaration, attached to the list supplied to the Settlement Administrator.

5.    A proposed stipulated protective order, or other method, to ensure the list remains confidential.  If appropriate, the Court may order the Settlement Administrator to be bound by the order.

6.    If necessary, whether, and how, the deadline for the class to respond to the settlement, as well as the remaining deadlines regarding the approval process, should be extended.

United States District Court
Northern District of California

1        If the parties cannot agree, they are ordered to submit clearly red-lined competing

2    proposals to the Court, bearing in mind that the Court will choose one of the parties' proposals,

3    and avoid crafting something anew, if at all possible.

4        Upon receipt of this proposal or proposals, the Court shall issue an order directing the

5    Settlement Administrator to circulate the corrective notice and to invalidate the necessary opt-out

6    elections.  This order shall also require Chapter 57 to reimburse the Settlement Administrator for

7    all printing and mailing costs related to the curative notice.

8

9        IT IS SO ORDERED.

10   Dated: July 29, 2016

11   _____

12                  JON S. TIGAR
               United States District Judge